J-A02007-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :--- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TODD RICHARD FERRY | : | |
| | : | |
| Appellant | : | No. 1897 WDA 2016 |

Appeal from the Judgment of Sentence November 4, 2016
In the Court of Common Pleas of Bedford County Criminal Division at
No(s): CP-05-CR-0000177-2015

BEFORE: BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.: FILED JUNE 08, 2018

Todd Richard Ferry appeals from the judgment of sentence of ten to twenty years imprisonment imposed after a jury convicted him of attempted kidnapping, false imprisonment of a person under eighteen, luring a child into a motor vehicle, and simple assault. We affirm.

On November 14, 2014, seventeen-year-old J.Z., a member of the Mennonite community, bicycled home from her job at a produce farm, accompanied by her friend, Ruthann.[1] She and Ruthann parted ways when J.Z. reached the lane that led to her family's farm. After retrieving the mail, as she did every day, J.Z. travelled up the lane until a man grabbed her,

_____

[1] All of the young Mennonite women discussed in this case have the same last name, although they are not all related to each other. For the sake of clarity, we refer to them by their first names.

knocking her off her bike. It was dark, and she was unable to see his face. N.T. Trial, 3/17/16, at 91. He repeatedly said "get in the car, you're coming with me." Id. at 78. The man held her by the shoulders and dragged her towards his truck, attempting to put something over her head and to open the door of the truck. Id. at 79, 94. J.Z. eventually pulled away from him and ran to the house, reporting the incident to her parents. Id. at 80. J.Z.'s dress and vest were torn in the struggle, and she sustained bruises to her shoulders and knees. Id. at 87-89, 135-37. J.Z.'s father went out to the lane and found her bicycle, the mail scattered on the ground, and a pair of black sweatpants with a knot tied in them. Id. at 152-55. Lab tests later revealed the presence of dark dog hairs on the pants. Id. at 270.

The next day, J.Z.'s mother found an envelope in the mailbox. She called the State Police, who arrived and opened it in her presence. The unsigned letter read as follows.

> I'm sorry about the wrestling match I had with you. I never meant no harm. I wanted you to talk to me. How does one non-Mennonite talk to a beautiful lady Mennonite? I fell in love with you and I seen you one year ago, and now . . . you'll never talk to me. I can't come to your house and ask your momma to date [her] daughter. I can't come to your place of work and ask you out. There is no way to approach you and now I have failed my only way. I hope you can understand. I still want to meet you and you don't need to fear me. I will never do that again. I promise. Sorry. Please forgive me.

Id. at 133.

In investigating the incident, Trooper Dana Martini of the Pennsylvania State Police interviewed people in the area, particularly other Mennonite girls

- 2 –

who traveled by bicycle, and Appellant's name came up several times.  Id. at 262-64.  Trooper Martini began surveilling Appellant, and observed that he drove a truck which matched the description of the one involved in the incident with J.Z., that he had a large, dark-colored dog, and that he visited several Mennonites on his day off.  Id. at 268.  Based upon these observations, Trooper Martini decided to interview Appellant.

Appellant, a man in his mid-fifties, initially denied involvement in the incident, and claimed not to have any knowledge of the lane on which the attack occurred.  Trooper Martini asked him to provide a buccal swab for DNA testing, and Appellant complied.[2]  Id. at 276.  Appellant agreed to be interviewed by Corporal Edward Mahalko, and continued to deny his involvement for approximately the first hour of the second interview.  After Corporal Mahalko confronted Appellant with the apology letter left in J.Z.'s mailbox, Appellant "changed his story."  Id. at 306.  Appellant then

> admitted to being at the location and doing the things that the victim described.  He stated he was there.  He just wanted to talk to her.  He thought she was another girl.  He admitted that he grabbed her wrist.  He admitted that he pulled on her wrist. He [stated] that he used the sweatpants that he left at the scene --- he knew that they fell.  . . .  He said that he used them to conceal his identity so she didn't recognize him.  And he said that he had written a note and took it back to her house. . . .

_____

[2] Lab tests revealed that the DNA Appellant provided matched DNA recovered both from the knot in the sweatpants left behind at the scene of J.Z.'s attack and from the envelope left in J.Z.'s mailbox.  Id. at 278.

Id. at 281.[3]

Other Mennonite girls and young women were also the object of Appellant's attentions. Joel Amick, Appellant's coworker, told Trooper Martini that Appellant knew the names of all of the Mennonite girls, thought they were pretty, and specifically was interested in "Ruthie" and "the one that rode bikes with Ruthie." Id. at 238-39. Appellant indicated that he knew where Ruthie and her friend worked. Id. at 239. Mr. Amick advised Appellant to be careful about the girls under eighteen, and Appellant responded with a laugh. Id. at 239-40.

Ruthann indicated that Appellant "was overly friendly" with her, bringing lunch to her and her coworkers at the market where she and J.Z. worked, inviting her to a Christmas party, and, on another occasion, inviting her to have pizza. Id. at 215-18, 221. Ruthann's sister, N.Z., when she was fourteen years old, did work for Appellant, including cleaning and husking corn. Id. at 207-08. While driving N.Z. and her sister to his house, Appellant indicated that he wanted to take her to his cabin in the mountains so she could clean it. Id. at 209. Another time, Appellant called N.Z. at home at night and asked her to meet him at the school "to talk with him." Id. at 210.

_____

[3] An audio recording was made of Appellant's statements and was played for the jury at trial. However, neither the CD nor the transcript of its contents is included in the certified record. The summary quoted herein was testified to by Trooper Martini at trial.

Upon testimony reflecting these facts, a jury convicted Appellant of the crimes indicated above. On November 4, 2017, the trial court sentence Appellant to ten to twenty years imprisonment on the attempted kidnapping count, and concluded that the other convictions merged for sentencing purposes. Appellant timely filed a post-sentence motion, which the trial court promptly denied without a hearing. Appellant filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Appellant presents this Court with the following questions.

I. Was the evidence insufficient, as a matter of law, to prove all of the required elements of the offenses of which [Appellant] was convicted?

II. Did the trial court err and/or abuse its discretion in permitting testimony of Commonwealth witnesses about non-criminal actions and statements by [Appellant] that were irrelevant, had the effect of impugning the character of [Appellant], and/or did not have probative value that outweighed their potential for unfair prejudice to [Appellant]?

III. Did the trial court err and/or abuse its discretion in denying [Appellant's] pre-trial motion to suppress the statements and buccal swab he gave to the Pennsylvania State Police and in permitting the admission at trial of [Appellant's] DNA evidence obtained from the buccal swab?

IV. Did the trial court err and/or abuse its discretion in sentencing [Appellant] to the maximum permissible prison sentence under all of the facts and circumstances of this case?

V. Did the trial court err, as a matter of law, in sentencing [Appellant] outside the sentencing guidelines without issuing a contemporaneous written statement setting forth the reasons for deviating from the guidelines?

Appellant's brief at 6-7 (unnecessary capitalization omitted).

We begin with the law applicable to our review of Appellant's claim that the evidence was insufficient to sustain his convictions.[4]

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

Commonwealth v. Williams, 176 A.3d 298, 305-06 (Pa.Super. 2017) (citations and quotation marks omitted).

Appellant was convicted of criminal attempt–kidnapping. The attempt statute provides that "[a] person commits an attempt when, with intent to

_____

[4] We note with displeasure that both the trial court and the Commonwealth addressed only Appellant's sufficiency challenge regarding the attempted kidnapping conviction, declining to discuss the others because Appellant was not sentenced to additional penalties on those convictions. Trial Court Opinion, 2/10/17, at 9 n.6; Commonwealth's brief at 14-15. If Appellant's conviction is invalid, it must be vacated although it does not affect the length of his supervision. See, e.g., Ball v. United States, 470 U.S. 856, 865, (1985) (holding improper conviction, "even if it results in no greater sentence, is an impermissible punishment").

commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." In re R.D., 44 A.3d 657, 678 (Pa.Super. 2012) (internal quotation marks and citation omitted). The kidnapping statute provides that

> a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>
> > (1) To hold for ransom or reward, or as a shield or hostage.
> >
> > (2) To facilitate commission of any felony or flight thereafter.
> >
> > (3) To inflict bodily injury on or to terrorize the victim or another.
> >
> > (4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a).

Appellant argues that, although the Commonwealth's evidence showed that his actions in trying to get J.Z. to talk to him were "highly inappropriate," it failed to prove that he intended to remove her a substantial distance or isolate her for a substantial period of time, let alone to injure or terrorize her. Appellant's brief at 16-17. We disagree.

The evidence and the reasonable inferences therefrom show the following. Appellant's apology letter lamented that he was unable to speak to the young Mennonite girl while she was at work or with her family. Appellant thus accosted J.Z. while she was alone, grabbing her from her bike so he could speak with her. Since Appellant could not have the conversation he wanted outside her home, he took substantial steps toward his goal of isolating her. He tried to force her into his vehicle so he could remove her to a new location more susceptible to his design. J.Z.'s reactions to Appellant's entreaties to go elsewhere and talk to him made it abundantly clear that she was and would continue to be terrorized by his "highly inappropriate" attempt to get to know her by force. Had J.Z. not succeeded in evading Appellant, he would have forcibly moved her to another location.

From this, the jury was able to conclude beyond a reasonable doubt that Appellant committed the crime of attempted kidnapping. See, e.g., In re T.G., 836 A.2d 1003, 1007 (Pa.Super. 2003) (holding elements of kidnapping and false imprisonment were proven where "[t]he six-year-old victim was removed, without the consent of her parent, from a public place outside of a playmate's house and forcibly taken into the seclusion of [the juvenile's] home [next door]. [The juvenile] closed the door to her home, would not let the victim's playmate enter the house, and would not let the victim leave.").

Appellant next contests the validity of his conviction for false imprisonment. False imprisonment is the knowing, unlawful restraint of another "so as to interfere substantially with his liberty." 18 Pa.C.S. § 2903(b). Appellant maintains that the Commonwealth did not prove that Appellant substantially interfered with J.Z.'s liberty. Appellant's brief at 19.

As detailed above, when J.Z. declined to go with him to his truck and tried to flee, Appellant forcibly restrained her and dragged her towards his truck. His conduct in preventing her from escaping and going to the safety of her home was sufficient to establish that Appellant restrained J.Z. against her will. See In re T.G., supra.

Appellant also contends that the evidence was insufficient to sustain his conviction for luring a child into a motor vehicle. The relevant statute provides as follows: "[u]nless the circumstances reasonably indicate that the child is in need of assistance, a person who lures or attempts to lure a child into a motor vehicle or structure without the consent, express or implied, of the child's parent or guardian commits an offense." 18 Pa.C.S. § 2910(a).

Our Supreme Court has explained that "a 'lure' involves the making of a promise of pleasure or gain, the furnishing of a temptation or enticement, or the performance of some other affirmative act calculated to strongly induce another individual to take a particular action, usually and most often likely to result in his or her harm." Commonwealth v. Hart, 28 A.3d 898, 909 (Pa. 2011). Appellant argues that the Commonwealth presented "no

- 9 –

evidence whatsoever" that Appellant took any actions "in the nature of attracting, attempting, or enticing" J.Z. to get in his truck. Appellant's brief at 20.

The same argument was advanced, and soundly rejected, in Commonwealth v. Walker, 139 A.3d 225 (Pa.Super. 2016). In that case, the defendant contended that he was not guilty of luring his victim because he made no promises to persuade her to get into his car. Rather, he drove his car alongside the child as she was walking, grabbed her wrist, and pulled her toward his car with such force that she had to put her foot on the side of the vehicle to push away from him and escape his grip. Id. at 232. This Court observed that our Supreme Court's definition of luring in Hart, supra, broadly includes "some other affirmative act" designed "to strongly induce" the child to get into the motor vehicle. Accordingly, we held that the evidence that the defendant attempted to get his victim into his car by physical force was sufficient to establish an affirmative act by the defendant calculated to induce his victim to enter the car.

The instant case is not materially distinguishable from Walker. Appellant grabbed J.Z. and dragged her towards his truck, saying "get in the car, you're coming with me." N.T. Trial, 3/17/16, at 78. She fought him off, and ultimately used a fence as leverage to escape his grasp. The Commonwealth thus showed that Appellant took affirmative acts designed to

induce J.Z. to get into his motor vehicle, which was sufficient to establish luring.

Finally, Appellant maintains that there was insufficient evidence to establish that he committed simple assault. The simple assault statute provides, in relevant part, that "a person is guilty of assault if he: . . . attempts by physical menace to put another in fear of imminent serious bodily injury[.]" 18 Pa.C.S. § 2701(a)(3). Appellant argues that the Commonwealth failed to prove that he put J.Z. in fear of serious bodily injury by his physical menace. Appellant's brief at 21.

We again disagree. J.Z. testified that Appellant ran at her in the dark, grabbed her by the shoulder, knocked her off her bike, dragged her towards his truck, attempted to cover her head, and chased after her when she broke away from his grasp, causing her to fear that he was going to injure her more than he already had. N.T. Trial, 3/17/16, at 78-80. This evidence was sufficient to establish simple assault. See Walker, supra at 233–34 (holding evidence established physical menace causing fear of serious bodily injury where Walker, "a [forty-one-]year-old man, clearly attempted to subdue T.H., an [eleven-]year-old child, by grabbing her wrist and pulling her to his car. [Walker] made a very explicit, sexual comment to T.H. just prior to gripping her wrist, and held T.H. with such force that she had to put her foot against his car to gain leverage to escape his grasp. T.H. could

have fallen backward and struck her head, or injured herself in some other serious manner, due to [Walker's] physically restraining her in this way.").

Having determined that Appellant's convictions are supported by sufficient evidence, we next consider Appellant's evidentiary challenges, mindful of our standard of review.

> The admissibility of evidence is a matter addressed solely to the discretion of the trial court, and may be reversed only upon a showing that the court abused its discretion. For there to be abuse of discretion, the sentencing court must have ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Commonwealth v. Johnson, 179 A.3d 1105, 1119-20 (Pa.Super. 2018) (internal citations and quotation marks omitted).

Appellant first contends that the trial court erred in allowing the Commonwealth to present evidence pursuant to Pa.R.E. 404(b). That Rule provides as follows.

> (b) Crimes, Wrongs or Other Acts.
>
> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

Appellant argues that "the trial court erred in permitting the testimony of six Commonwealth witnesses about actions or statements allegedly made by [Appellant] that were either irrelevant, had the effect of impugning his character, or did not have probative value that outweighed their potential for unfair prejudice to [Appellant]." Appellant's brief at 23. Appellant points to certain testimony offered by J.Z.'s friend Ruthann; by Ruthann's sister, N.Z.; by David Martin, the manager of the farm market where J.Z. and Ruthann worked; by J.Z.'s sister; by Joel Amick, Appellant's coworker; and by Trooper Martini.

Specifically, Appellant complains about the following testimony.[5] Mr. Martin testified that he saw Appellant in the store on one occassion, and his

_____

[5] In his Rule 1925(b) statement, Appellant did not identify the allegedly-offending testimony, or even which witness or witnesses offered it. Rather, he vaguely complained the trial court allowed testimony about "non-criminal acts," permitted testimony that "had the effect of impugning the character of" Appellant, and overruled objections "to testimony that was irrelevant, prejudicial, beyond the scope of the offer of proof, beyond the scope of cross-examination, contained hearsay, and/or was unduly prejudicial to" Appellant. Concise Statement, 12/30/16, at ¶¶ 6-8. Unsurprisingly, the trial court in its Rule 1925(a) opinion chose to neither explain its reasons for every single objection Appellant made at trial nor to speculate about which specific ones Appellant intended to argue before this Court. Trial Court Opinion, 2/10/17, at 5. As a consequence, we do not have the benefit of a trial court opinion supporting the six specific claims Appellant raises on appeal, and we could hold that Appellant waived all of these issues. Commonwealth v. Reeves, 907 A.2d 1, 2 (Pa.Super. 2006) ("[A] Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.") (citation omitted). However, because we do not find our review unduly hampered, we will address the merits of the arguments.

employees told him that Appellant was the person who dropped off food once. Appellant's brief at 24. N.Z. testified that Appellant asked her, when she was fourteen, to go to his mountain cabin and to meet him at the school to talk. Id. at 25. Ruthann testified that Appellant brought lunch a few times, invited her to dinner and a Christmas party, and was overly friendly to her, making her uncomfortable. Id. at 25-26. Mr. Amick testified as an adverse witness that Appellant knew all of the Mennonite girls by name, thought they were pretty, wanted to ask one to the office Christmas party, and laughed when warned to be careful with those under eighteen. Id. at 27. J.Z.'s sister, who had previously worked at the market where Ruthann and J.Z. worked, testified that she did not know Appellant and would not have been receptive to talking to him or getting into his truck on the night he assaulted J.Z..[6] Id. at 28. Finally, Trooper Martini relayed in her testimony that people she had interviewed during her investigation mentioned Appellant as being interested in the Mennonite community, but only in the Mennonite girls. Id.

Appellant makes the following argument against the admission of this testimony.

_____

[6] It has been Appellant's contention that on the night in question he thought J.Z. was her older sister, who is over the age of eighteen. See, e.g., Appellant's brief at 16-17 ("[C]learly he thought [J.Z.] was her older sister[.]").

None of this testimony involved any conduct or statements by [Appellant] that were sexual, forcible or aggressive in nature. Rather, this evidence, at most, showed only that [Appellant] knew a number of the people in the Mennonite community, that he was friendly toward them, that he found several of the young Mennonite women attractive, that he was interested in establishing a relationship with a few of them, that a couple of them had worked for him in the past, and that he brought lunch on three occasions for the workers at a farm market where several Mennonites were employed. However, it is evident that the intent of the Commonwealth in presenting this evidence, together with the women's negative reactions to [Appellant's] actions and statements, was to raise questions in the jury's minds as to [Appellant's] character and intentions and to suggest that he intended to take [J.Z.] a substantial distance from the location of the incident and/or to confine her for a substantial period of time in a place of isolation, which would have been sheer conjecture and speculation.

Appellant's brief at 28-29.

Appellant's argument proves its own lack of merit. The conduct cannot be both irrelevant and suggestive of Appellant's intent. The evidence cannot reflect wholly innocent conduct, and yet be so prejudicial as to outweigh its probative value. It appears to us that the evidence went to Appellant's intent when he grabbed J.Z. and tried to drag her to his truck, making it relevant. Thus, even if the acts at issue amount to "crimes, wrongs, or other acts" evidence subject to Rule 404(b), it was permissible under Rule 404(b)(2) to prove intent. See, e.g., Commonwealth v. Sherwood, 982 A.2d 483, 497 (Pa. 2009) (finding testimony about prior assaults was relevant to refute the defendant's claim that he did not intend to hurt the victim); Commonwealth v. Diehl, 140 A.3d 34, 41 (Pa.Super. 2016) ("The admission of [404(b)] evidence becomes problematic only when its

- 15 –

prejudicial effect creates a danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial."). The nature of the evidence was not likely to evoke a passionate response that would impede the jurors' ability to rationally decide Appellant's guilt or innocence.

In any event, were we to agree with Appellant that the evidence was erroneously admitted, we would nonetheless hold that it was harmless error. Given J.Z.'s testimony about the attack, the DNA evidence placing Appellant at the scene and as the author of the apology letter, and Appellant's corroboration of J.Z.'s account of the assault in his letter and statement to police, the evidence of guilt was overwhelming. See, e.g., Commonwealth v. Shull, 148 A.3d 820, 846 (Pa.Super. 2016) (holding in appeal from robbery and assault convictions that, if trial court erred in failing to sustain objections to testimony that Shull had stolen items from two different stores on the same night he robbed the victim, "the uncontradicted evidence of guilt, namely, victim and police testimony identifying Shull as the gun-toting assailant who violently assaulted [the victim] in a robbery attempt, is so overwhelming, so that by comparison, the errors at issue are insignificant") (internal quotation marks omitted). Appellant's Rule 404(b) arguments merit no relief.

Appellant next challenges the denial of his pretrial motion to suppress his statements and the DNA test results. Specifically, Appellant contends

that he was subjected to a custodial interrogation at the time he gave a buccal swab and his statement indicating that he had indeed grabbed J.Z. from her bike, without first being advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Appellant's brief at 32-34.

"Our law is well settled that an individual is entitled to Miranda warnings only when he is subject to a custodial interrogation." Commonwealth v. Witmayer, 144 A.3d 939, 948 (Pa.Super. 2016). However, we need not examine whether, or at what point, Appellant became the subject of a custodial interrogation, because the record is clear that Appellant was in fact advised of his Miranda rights at the beginning of each interview.

Trooper Martini testified at the hearing on Appellant's suppression motion that she called Appellant to request that he come to the police station for an interview. N.T. Omnibus Pretrial Motion Hearing, 10/2/15, at 19-21. Appellant agreed, drove himself to the station, and signed the visitor's log. Id. at 21. Trooper Martini began the interview by advising Appellant of his Miranda rights, and Appellant gave both written and oral waivers of those rights. Id. at 22.

Although he did not admit to attacking J.Z. during the interview with Trooper Martini, she noted that Appellant showed "deceptive behaviors" and "made some incriminating statements." Id. at 27. She asked Appellant if he would be willing to give a DNA sample. Id. at 28. Appellant consented

without hesitation, stating that "he didn't have anything to hide," and provided the buccal swab. Id. at 28-29.

Trooper Martini also asked Appellant if he was willing to be interviewed by Corporal Mahalko, and Appellant agreed. Id. at 270. Corporal Mahalko indicated that it would take him approximately ninety minutes to get there, but Appellant indicated that he had no problem with waiting. Id. at 28.

When Corporal Mahalko arrived, he began his interview by again giving Appellant Miranda warnings, which is his practice for all interviews whether the interviewee is in custody or not. Id. at 73-74. Appellant acknowledged his rights and indicated that he was willing to talk to Corporal Mahalko. Id. at 74. After Corporal Mahalko brought up the apology letter found in J.Z.'s mailbox, Appellant initially persisted in his denials, but then admitted that he had done it, thinking that it was J.Z.'s sister. He had waited in the lane to meet J.Z.'s sister, with sweatpants covering his face so she would not see him. Id. at 78. Not realizing it was the wrong person, he went up to her when she came by on her bike and said he wanted her to come into his truck to talk to him. Id. at 76. J.Z. got scared and fell down, and Appellant grabbed her by the wrist, pulling her up and saying "come into the truck and talk to me." Id. at 76-77.

The trial court credited the testimony of both Trooper Martini and Corporal Mahalko. Trial Court Opinion, 2/20/17, at 2. Appellant offers no argument that there was any deficiency in either the Miranda warnings or

Appellant's waiver of his rights. Accordingly, we, like the trial court, are "confused at [Appellant's] pursuit of this issue on appeal." Id. at 3. We discern no merit in Appellant's contention that a Miranda violation warrants suppression of his statements or the DNA evidence. [7]

Having concluded that the evidence was sufficient to sustain Appellant's convictions and that none of the alleged evidentiary errors warrants the grant of a new trial, we turn to his challenge to the discretionary aspects of his sentence. The following principles apply to our review.

> An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
> > (1) whether appellant has filed a timely notice of appeal, see Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

_____

[7] In his brief, Appellant also asserts that the trial court committed reversible error in not giving Appellant's trial counsel sufficient opportunity to review the transcripts of his interviews with Trooper Martini and Corporal Mahalko. Appellant's brief at 37. This issue was not raised in his 1925(b) statement or addressed by the trial court, and therefore it is not properly before this Court. Commonwealth v. Hill, 16 A.3d 484, 494 (Pa. 2011) ("[A]ny issues not raised in a Rule 1925(b) statement will be deemed waived[.]").

Commonwealth v. Samuel, 102 A.3d 1001, 1006-07 (Pa.Super. 2014) (some citations omitted).

Appellant filed a notice of appeal after preserving his issues by including them in a motion to modify sentence and his Pa.R.A.P. 1925(b) statement. Further, Appellant's brief contains a statement pursuant to Pa.R.A.P. 2119(f), in which he claims that the trial court's imposition of the statutory maximum sentence was excessive under the circumstances, including the fact that he had no prior record; was based upon factors not supported by the record; and lacked sufficient basis for deviating from the guidelines. Appellant's brief at 13. Appellant has raised substantial questions. See, e.g., Commonwealth v. Garcia-Rivera, 983 A.2d 777, 780 (Pa.Super. 2009) ("[A] claim the trial court failed to state its reasons for deviating from the guidelines presents a substantial question for review."); Commonwealth v. Simpson, 829 A.2d 334, 338 (Pa.Super. 2003) ("[A] claim that the sentence is excessive because the trial court relied on impermissible factors raises a substantial question."). Accordingly, we proceed to the merits of his arguments.

> [T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest

unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

Where the trial court deviates above the guidelines, this Court may only vacate and remand a case for resentencing if we first conclude that the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. Although the Sentencing Code does not define the term unreasonable, our Supreme Court has made clear that rejection of a sentencing court's imposition of sentence on unreasonableness grounds [should] occur infrequently, whether the sentence is above or below the guideline ranges, especially when the unreasonableness inquiry is conducted using the proper standard of review.

Commonwealth v. Bullock, 170 A.3d 1109, 1126 (Pa.Super. 2017) (internal quotation marks and citations omitted).

Here, the trial court sentenced Appellant to the maximum penalty allowed by law for attempted kidnapping: ten to twenty years.[8]  Appellant notes that, with a prior record score of zero and an offense gravity score of nine, the applicable standard range of the guidelines called for a sentence of twelve to twenty-four months imprisonment, and twenty-five to thirty-six months in the aggravated range.  Appellant's brief at 39.

_____

[8] At the sentencing hearing, the Commonwealth recommended "a serious upward departure from the guidelines," namely an aggregate sentence of ten to twenty-seven years, claiming Appellant should be under supervision for the rest of his life.  N.T. Sentence Hearing, 11/4/16, at 10-11.  However, the trial court held that all of Appellant's other convictions merged with the attempted kidnapping conviction for sentencing purposes, and sentenced him only on the latter charge.  Id. at 38.  The Commonwealth has not appealed the trial court's ruling on merger.

Appellant maintains that the upward deviation from the guidelines was an abuse of discretion for several reasons. First, Appellant suggests that there was minimal harm caused, arguing the incident lasted only a few minutes, J.Z. suffered no significant injuries, Appellant promptly left an apology note, and Appellant had no prior criminal record. Id. at 40. Appellant also claims that the trial court failed to consider the guidelines at all, and instead rejected them outright because it thought they were too low for any kidnapping case. Id. Further, Appellant indicates that the record did not support factual assertions the trial court made in support of its sentence, such as that there was "extreme premeditation" and that Appellant continued to seek contact with J.Z. after the incident. Id. at 40-41.

Prior to imposing Appellant's sentence, the trial court considered the statements of counsel and a pre-sentence investigation report, including letters from Appellant and many members of his family. After acknowledging that Appellant has a good, supportive family, and that he has no reason to doubt that Appellant is, as they contended, a hard worker, the court offered the following discussion.

> I have seen absolutely no remorse from [Appellant]. He can sit there and say that he's sorry for today. I'm not exactly sure what he's sorry about.
>
> In his letter . . . in the very first paragraph, he's, he explains that he didn't intend to hurt, or harm her, which is one thing I guess you could say.

But his position is: He was just coming out of the lane, and it was just an accident that he happened to run into her. That, that's completely unsupported by any fact in the case.

. . . .

. . . I think he terrorized her, and I accept that as, as credible. He was forceful. He forcibly tried to get her into the car. . . . For him to tell me in his letter that this was just in some accident that he happened to come upon her, that's beyond the realm of imagination. It just is.

So for him to come in here today and say that I'm sorry. I don't know what he's apologizing for and -- because he hasn't taken acceptance of responsibility for anything that he did to this girl.

In fact, he took more responsibility for it in the, the letter he wrote to the family after he tried to take her in saying that I'm sorry for the wrestling match. To be honest with you, that's more of an apology than he's given at any other point during the proceedings.

Now, I don't take that as remorse because he did not say who it was. . . . I just see no remorse or, and I think in the bigger part for his rehabilitative needs[,] I see no appreciation for, one, how he scared the girl, how he affected the community in any way. Just, just no appreciation for those factors.

. . . .

This was not a chance encounter as [Appellant] would have me believe it. It wasn't even a situation I don't believe where he happened to see the girl and got the idea that he wanted to talk to her or take her in his car.

I believe the way the testimony came in, it is clear to me that he had planned this to great detail. The girl testified that she always rode home on the bikes with her friend. And as soon as she hit her driveway, she turned off, or peeled off from her friend, and from the end of her driveway to her house, which was I believe from the testimony a hundred yards or a couple hundred yards, it was only that stretch of area, and only during that time of day, that this girl was alone. And for him to be

sitting in the middle of that lane knowing that that's the only time this girl is alone causes me a great deal of concern in this case.

Because I [b]elieve for [Appellant] to know that he would have to observe this girl for a long period of time to know exactly when he could have gotten her alone. And as I listened to the testimony during the trial, I think that's the one factor that caused me a great deal of concern over the public safety for [Appellant].

Because there are very few cases that I have seen in this courtroom where I think the premeditation in this case was so great. Because he had to narrow down the time window of when she was alone, and narrow down an exact location of when she was alone in order to commit this crime.

The other factors are that he did forcibly injure her. There's testimony that there were marks on her, left on her. That there was a tear in her dress. I find that all as credible as well.

And add into the fact of . . . the premeditation prior to committing the crime. The testimony regarding his actions following the crime causes me great concern as well. Leaving a note for the victim's family to find that tries to -- he doesn't identify himself.

Now, ultimately it ended up identifying him. But he didn't identify himself, and he just tried to play it off as another, just some wrestling match with the girl.

The fact that he did that is, is anti-social. It's strange behavior. The fact that he followed up with visits to the girl's employment following the incident causes me great concern. Because it's evidence of the fact that not only did he do this to this girl, and plan it in a great manner, but he couldn't stay away from her.

He had to re-visit her, and continue to talk to her knowing that an investigation was going on. That's anti-social behavior.

I feel the guidelines are not indicative of the protection of the public and the gravity of the offense and his rehabilitative

- 24 –

needs in this case. Quite frankly, I think the guidelines are low. Even on a normal kidnapping case, but as I see this one. . .

I keep trying to see a situation where I feel comfortable in an, in sentencing anything less than the maximum in the kidnapping. And I do not see what -- I can't arrive at it. I cannot arrive at it.

Given that this was a child, given the extreme premeditation that was involved in the case, given his lack of remorse, a lack of appreciation of what he did to this girl, her terror that was involved in it, and the fact that he just kept following up with contact with her just heightens the protection of the public in the case that I believe, and the gravity of the offense, and his rehabilitative needs being that incarceration is needed in this case. I just am, I cannot be left with any other result other than a maximum on the, on the kidnapping. I just cannot.

N.T. Sentencing Hearing, 11/4/16, at 30-36 (unnecessary capitalization omitted).

Contrary to Appellant's arguments, we find the trial court's reasoning supported by the record. Appellant's anonymous apology letter does not reflect acceptance of the impact of his actions. The evidence at trial, discussed at length above, fully supports the trial court's characterization of the attempted kidnapping as being meticulously planned and based upon extensive observation of these young women. Appellant's claim that he just happened to be in the driveway when J.Z. returned to her home in the dark reveals his complete lack of acceptance or remorse for his guilt. The evidence at trial also showed that Appellant continued to pursue contact with the Mennonite girls after the incident, as Ruthann testified that Appellant

continued to come to J.Z.'s workplace in the winter of 2015, which was during the Troopers' investigation. N.T. Trial, 3/17/16, at 215-16.

Moreover, from our foregoing review of the sufficiency of the evidence to sustain Appellant's convictions, it is clear that the terror and physical harm caused to J.Z. were not elements of the crime of attempted kidnapping already accounted for by the offense gravity score. Indeed, as the statute is written, a kidnapping can be accomplished without the victim even being aware that he or she has been kidnapped. The trial court's reliance on those particular factors in Appellant's perpetration of this attempted kidnapping, as well as J.Z.'s minority and Appellant's lack of remorse, therefore, justifies an upward deviation from the guidelines range. Accord Commonwealth v. Walls, 926 A.2d 957, 967 (Pa. 2007) (holding trial court acted within its discretion in considering extreme youth of the granddaughter-victim and defendant's position of trust in deviating from the guidelines and imposing statutory maximum sentences for rape and involuntary deviate sexual intercourse with a victim less than thirteen years old). While the sentence is undoubtedly harsh, we cannot conclude that it constituted an abuse of the trial court's discretion.

Appellant also argues that the trial court erred in failing to give a contemporaneous statement of its reasons for deviating from the guidelines as is required by 42 Pa.C.S. § 9721(b). The on-the-record discussion detailed above satisfies that requirement. See Commonwealth v. Rodda,

723 A.2d 212, 216 (Pa.Super. 1999) (en banc) ("[W]hen imposing sentence, a trial court has rendered a proper 'contemporaneous statement' under section 9721(b) . . . so long as the record demonstrates with clarity that the court considered the sentencing guidelines in a rational and systematic way and made a dispassionate decision to depart from them.").

None of Appellant's arguments convinces us that the trial court's imposition of the statutory maximum sentence for attempted kidnapping was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." Bullock, supra at 1126. Hence, we find no abuse of discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2018